[Crim. No. 1378.   In Bank.—August 9, 1907.]

THE PEOPLE, Respondent, v. HENRY SMITH, Appellant.

CRIMINAL LAW — INSTRUCTIONS ALREADY GIVEN.—Where the instructions given by the court of its own motion embraced the same principles of law contained in the instructions asked by the defendant, the refusal to give the instructions requested by the defendant is without prejudice.

ID.—MURDER—EVIDENCE OF CONVERSATION IN ABSENCE OF DEFENDANT.
—In a prosecution for murder, a conversation had in the absence
of the defendant between his brother and the deceased, which the
defendant, in the quarrel leading up to the homicide, refers to and
demands to have repeated to him, is admissible in evidence as throw-
ing light upon the purpose and motive of the defendant in making
the demand.

ID.—QUESTION APPARENTLY PROPER—MOTION TO STRIKE OUT ANSWER
—WAIVER OF OBJECTION.—Where there is nothing on the face of a
question to indicate that an answer to it would be incompetent,
immaterial, and irrelevant, the overruling of an objection to it on
that ground was proper; and if the question only appeared to be
vulnerable to such objections when the answer was given, it was
incumbent on the adverse party to move to strike out the answer,
and if he failed so to do, no error can be predicated on the overrul-
ing of the objection.

ID.—CONSPIRACY—DECLARATIONS OF CONSPIRATOR WHEN ADMISSIBLE.—
The rule allowing statements or declarations of one conspirator to
be given in evidence as against his co-conspirator requires not only
that the conspiracy be pending and its object not consummated when
the statements or declarations are made, but also that such state-
ments, in order to be admissible, must be in aid and furtherance of
the common purpose or design of the conspiracy. Declarations show-
ing past acts, or expressing merely the opinion or desire of the con-
spirator making them, are not binding upon any one except himself
or those in whose presence they are made.

ID.—DECLARATIONS NOT IN FURTHERANCE OF CONSPIRACY.—On a trial for
murder, claimed to have been perpetrated in pursuance of a con-
spiracy between the defendant and another, a declaration of the co-
conspirator, made after he had fled from the scene of the killing,
and while the conflict between the deceased and the defendant
was practically on, to the effect that he knew that the deceased was
"going to get it," is inadmissible, as it was not made at a time
when he was aiding in furthering the object of the conspiracy, nor
was it in any manner in aid or furtherance thereof.

ID.—SELF-DEFENSE—RELATIVE STRENGTH OF DEFENDANT AND DECEASED
—EVIDENCE OF PHYSICIAN.—On a trial for murder, where the defense
is self-defense, it is always competent to show the relative physical
strength of the deceased and the defendant, as bearing upon the
question whether the defendant acted under a reasonable apprehen-
sion of the infliction upon him by the deceased of great bodily injury
or death at the time he killed him; and as an aid in determining that
question, the defendant is entitled to introduce in evidence the testi-
mony of a physician to show that he had him under his medical treat-
ment for a particular disease for two and a half years prior to the
homicide, and the effect that disease had in impairing his strength.
Error in rejecting the testimony of such physician is not rendered
harmless by the fact that the defendant himself testified on the
subject of the disease.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial. F. H. Dunne, Judge.

The facts are stated in the opinion of the court.

Frank J. Murphy, for Appellant.

U. S. Webb, Attorney-General, C. N. Post, Assistant Attorney-General, and J. Charles Jones, for Respondent.

LORIGAN, J.—The appellant was charged with murder in the killing of one Joseph McCann in the city of San Francisco, and on trial was convicted of manslaughter. He appeals from the judgment and order denying his motion for a new trial.

It was insisted by the defendant upon the trial that the killing of McCann was committed by him in necessary self-defense.

Several grounds are urged for a reversal, and in order that these may be properly considered it is necessary to refer to some of the evidence in the case. That evidence tended to show that on the afternoon of the day of the homicide (January 11, 1905) the deceased was in Meyerborg's saloon, at the southwest corner of Taylor and Eddy streets, in the city of San Francisco, drinking, when Fred Smith, a brother of the defendant, entered. It does not appear that these two were acquainted, but as soon as Fred Smith entered McCann stepped up to him and addressed him as a "little son-of-a-bitch" and characterized his mother and sister as whores. Fred Smith, with tears in his eyes, told McCann that he (Smith) was only a little fellow and unable to defend himself, but that he had a brother who would make him "eat those words" or "repeat those words," if he would wait until he could get him. McCann said he would wait, and Fred Smith left the saloon. Some fifteen minutes later Henry Smith, the defendant, the brother of Fred Smith, walked into the saloon, took a glass of beer, and then went out. He immediately returned with Fred Smith, who had remained on the outside when defendant first entered the saloon, and as they came in the latter pointed to McCann as the person who had used the language about their mother

and sister, saying, "That is the man." The defendant, addressing McCann, said, "Did you call my mother a whore?" Fred Smith then immediately said, "Can you repeat them words over again?" followed by the defendant also saying, "Can you repeat them again?" Before anything further could occur, save probably a response by McCann that he could, the defendant was grasped by a bystander, who, assisted by the barkeeper, put him out of the saloon. At the time the defendant entered the saloon he was armed, and there was some evidence that as he spoke to McCann when he last entered he made a motion to draw a pistol. After being put out of the saloon defendant and his brother went to another saloon on the northwest corner of Taylor and Eddy streets, where they remained about ten minutes, came out and started across Eddy Street in the direction of their home on Taylor Street. As they crossed Eddy Street, McCann, who was either standing in front of Meyerborg's saloon or had just then come out of the Eddy-Street entrance to it, saw them approaching, and started towards the defendant, called him a "little son-of-a-bitch," and said "You got a gun," and tried to grasp him. The defendant ran out on Taylor Street, followed by McCann, who overtook him and grasped him, and they fell on the street, the deceased on top of the defendant. As to what occurred when McCann reached the defendant, and just when the shots which occasioned his death were fired, is in dispute under the evidence. There was evidence, however, on the part of the defendant that when McCann overtook the defendant he struck him on the side of the face, then caught hold of him, threw him down on the street, got on top of him, grasped him by the throat, saying, "You little son-of-a-bitch, I will kill you with your own gun," struck him again, and was bumping his head against the cobble-stones, when defendant pulled his pistol from his hip pocket and fired twice, both shots taking effect in the body of McCann and causing his death the day following. While McCann was pursuing the defendant, Fred Smith, his brother, ran into a store in the vicinity and was looking out of the show-window on Taylor Street, when the proprietor thereof addressed him, inquiring what was the matter. The only response made by Fred Smith was, "I knew he was going to get it." This statement of Fred Smith was proven

to have been made between the firing of the first and second shots at McCann by the defendant, and was admitted over the objection of the defense.

It further appeared from the evidence that McCann was a marble-cutter, forty-five years of age, and weighed about two hundred and forty pounds. The defendant was twenty-one years of age, had been employed as a solicitor in the clothing business, and, according to his own testimony, weighed some time prior to the homicide, about one hundred and five pounds, and for three and a half years had suffered from catarrh of the stomach, and had been under the care of a physician, Dr. Newton, for two and a half years prior to the date of the conflict.

This is a sufficient statement of the evidence to illustrate the points made upon this appeal.

Complaint is first made of the refusal of the court to give certain instructions which were requested by the appellant. As the record, however, shows that the instructions given by the court of its own motion embraced the same principles of law contained in the instructions asked by the defendant, he has no valid ground of complaint that the instructions tendered by him embodying the same principles were refused.

It is also insisted that the court erred in allowing certain witnesses for the prosecution to state the language used by the deceased towards Fred Smith in the saloon in which he called the mother of the defendant a whore. The claim of appellant is that, as he was not present at the time the language was used, evidence relative to its use was inadmissible against him. Before any proof of the use of this language by deceased was made it was shown that defendant on his second entry into the saloon, and after his brother had pointed out the deceased as the man who used the language, said, "Did you call my mother a whore?" and "Can you repeat them [words] again?" Under these circumstances evidence of the language used by McCann towards Fred Smith about the mother of defendant, even though uttered in the absence of defendant, was admissible as explaining what defendant meant and to what he had reference when inquiring of McCann whether he had used the language and asking him whether he could repeat it. Particularly is this true in view of the fact that Fred Smith, the brother of defendant, at this same time

inquired of McCann whether he could "repeat them words over again," followed immediately by the same inquiry made by the defendant. The jury were entitled to know what was meant by the inquiry of defendant as to whether deceased could repeat "them words again," and to know what words of deceased defendant referred to, in order to clearly understand the inquiry addressed by defendant to McCann, and as throwing light upon the purpose and motive of defendant in making it.

It is next urged that the court erred in overruling the objection of appellant to the admission in evidence of the declaration made by Fred Smith while the shooting was taking place,—namely, "I knew he was going to get it." It is insisted by the respondent that the defendant cannot avail himself upon this appeal of the alleged error in the admission of this evidence, because, although he objected to the question asked, he did not after it was answered move to strike out the response. This point is undoubtedly good. There was nothing on the face of the question to indicate that an answer to it might not be relevant, material, and competent evidence, and hence it was not improper to overrule the objection urged against the inquiry upon the only ground urged,—namely, that it was irrelevant, immaterial, and incompetent. The question only appeared to be vulnerable to all these objections when the answer to it was given, and as that was the first and only time it appeared to be so, it was the duty of the defendant to move to strike the answer out, and having failed to do so, no error can be predicated on the overruling of the objection. (*People* v. *Williams,* 127 Cal. 216, [59 Pac. 581] ; *People* v. *Lawrence,* 143 Cal. 148, 156, [76 Pac. 893].)

If this were the only point made for a reversal of the judgment, we would, for that reason, have to hold that it was not well taken; but as the cause must go back for a new trial, we feel impelled to dispose of the question as to the admissibility of this evidence upon its merits, and now proceed to do so.

The theory of the prosecution on the trial of the case was that after McCann had used the language to Fred Smith when he first came in the saloon concerning his mother and sister, the latter sought the defendant and a conspiracy was entered into between them to kill McCann, and in defense

of this ruling of the trial court it is insisted by respondent that there was evidence in the case tending to show such conspiracy; that it was still existent and its object had not been finally accomplished when the declaration was made, as the second shot had not then been fired by defendant; that as Fred Smith was a conspirator with defendant when this declaration was made by him, and was made pending the conspiracy and in furtherance of its design, it was admissible evidence against his co-conspirator, the defendant.

We cannot agree with the position of respondent, and are of the opinion this evidence is inadmissible.

We do not discuss the claim made by appellant that there was no evidence in the case supporting the theory of a conspiracy. It was insisted on the trial that there was, and evidence was introduced which, it is asserted now, supported that claim. ° Whether there was or was not a conspiracy entered into between these brothers having for its object the killing of McCann is a question of fact to be determined by a jury from the evidence, under appropriate instructions from the court, and as the question immediately under consideration does not involve any inquiry as to whether there was or was not sufficient proof of the conspiracy, that question is left where it properly belongs upon a new trial,—namely, to the jury. For the purposes of present consideration, if it should be conceded there was sufficient proof of a conspiracy, still we do not think that this declaration of Fred Smith was admissible. The rule allowing statements or declarations of one conspirator to be given in evidence as against his co-conspirator requires not only that the conspiracy be pending and its object not consummated when the statements or declarations are made, but also that such statements, in order to be admissible, must be in aid and furtherance of the common purpose or design of the conspiracy.

The rule is stated in Cyclopedia of Law and Procedure (vol. 8, p. 680) : "Acts or declarations of a conspirator cannot be admitted as against a co-conspirator, unless such acts were performed or declarations made in aid or execution of the conspiracy."

And as to the admission of such statements or declarations, it is said in *People* v. *Irvin*, 77 Cal. 494, 504, [20 Pac. 56, 59] : "No declarations except those made 'during the pendency of

CLI Cal.—40

the conspiracy and in furtherance of its objects' can be used against a co-conspirator. Declarations showing past acts, or expressing merely the opinion or desire of the conspirator making them, are not binding upon any one except himself, or those in whose presence they are made." (Citing cases.)

Now, examining the declaration of Fred Smith admitted in evidence in the light of the principle declared in these authorities, it is readily observable that such declaration was in no manner in aid or execution of the asserted conspiracy, or in any way in furtherance of its objects. A declaration, statement, or act of a conspirator, to be admissible as in "furtherance" of the conspiracy, must, as the word "further-ance," *ex vi termini*, imports, be an act, statement, or declaration which in some measure, or to some extent, aids or assists towards the consummation of the object of the conspiracy. How can it be claimed that the declaration in question was of this character? When this declaration was made by Fred Smith the conflict between his brother and McCann was practically on, and he had fled from the scene to a place of safety. Certainly, it cannot be pretended that at the time he answered the inquiry of the storekeeper he was doing anything in aid of the killing of McCann or which tended to effect that object. His declaration that he knew that the deceased was "going to get it" was simply a statement of his belief or opinion on the subject. It was not made at a time when Fred Smith was aiding in furthering the object of the asserted conspiracy, nor was it a declaration in any manner in aid or furtherance of the alleged conspiracy, and as any declaration made by him could only be admissible if it were, such declaration was inadmissible when it was not.

The only authority cited by respondent in support of the ruling is the case of the *People* v. *Murphy,* 45 Cal. 137, but in that case the exclamation of Mrs. Murphy, the wife of the defendant who was on trial, accompanied acts done by her in furtherance of an apparent conspiracy entered into between her husband and herself to kill the deceased, and occurred in the presence and hearing of her husband at the time of the homicide, and was admissible for that reason under the rule.

The last ground for a reversal is predicated upon the refusal of the trial court to permit the appellant to show

what his physical condition was on the day of the homicide. In his statement to the jury before presenting the evidence on behalf of defendant, his attorney stated that among other matters which would be proven by the defense it would be shown that some time prior to, and at the time of, the homicide defendant was under the care and treatment of Dr. Newton, a physician of the city and county of San Francisco; that he was afflicted with catarrh of the stomach, and on the day of the homicide was weak and sick as a result of this disease.

Dr. Newton was called as a witness by the defendant to prove these facts, but the court refused to permit him to testify on the subject.

The rejection of this evidence by the court was error. The rule is uniform that when the defense is self-defense, it is always competent to show the relative physical strength of the deceased and the defendant. The defense in this case was self-defense. It was claimed by the defendant that the deceased was a larger and more powerful man than himself; that he had pursued him, struck him, and thrown him down upon the street; that he had him clutched by the throat, had declared his intention of killing him, and was beating his head on the cobblestones; and that to prevent the deceased from inflicting great bodily injury upon him, or carrying his threat of death into execution, and under a reasonable apprehension that he would do so, he fired the shots which killed him.

In considering that defense, the defendant was entitled to have go before the jury all evidence which tended to support it. It is always a material issue to such a defense whether defendant acted under a reasonable apprehension of the infliction upon him by deceased of great bodily injury or death at the time he killed him. And, as bearing upon that question, evidence of a great disparity of the relative physical condition of the deceased and the defendant is always an important and material fact to be considered by the jury. Common experience teaches that when an attack is made without deadly weapons by one who is physically weak and feeble upon another of vigorous physical condition and of superior strength, there is no room for asserting that any reasonable apprehension of injury from such an assault could exist

which would warrant killing the assailant. When, however, the assailant is a larger and more powerful man than the assailed, and the latter is unable to resist his attack, either on account of inferior natural physical vigor or muscular debility occasioned through disease, it is equally general experience that such inability to resist on such account would naturally operate upon the mind of the assailed to create an apprehension of danger, which, if reasonably entertained, might justify him in killing his assailant. Whether he had grounds for a reasonable apprehension would be for the jury, and any evidence is competent which has a tendency to prove that fact. Certainly, evidence tending to show that a defendant was weak and enfeebled from disease would have a bearing upon that issue. It is only natural that one unable to successfully resist a dangerous assault made upon him because suffering from disease which has impaired his strength would more readily believe he was in imminent danger than if he were healthy and vigorous. Of course, the belief of the defendant that he was in such danger would not be conclusive. It would be for the jury to determine whether as a reasonable man he was justified in so believing. But in determining that question a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind, and as a debilitated physical condition preventing him from successfully resisting his assailant might reasonably be expected so to do, a defendant is entitled to have evidence of that fact, if it be a fact, go before the jury to be considered by them, with the other circumstances in the case, in ascertaining whether the plea of self-defense is sustained. The physical condition of the defendant is always important under such a plea in determining what a reasonable man in the position of the defendant would have done under the same conditions.

This principle of law is so well established that the citation of authorities is unnecessary. In fact, we do not understand the rule to be questioned by the respondent. Its position relative to this rejected evidence is that the defendant was not prejudiced by the ruling because he testified himself on the subject of the disease from which he was suffering. It is true he did testify that he had been afflicted with the disease for almost three years and a half, and had been

under the care of Dr. Newton for two years and a half prior to the homicide. He did not, however, testify as to the effect of such disease upon his physical condition, and to what extent, if any, it affected him or impaired his strength or vigor, matters upon which it is to be assumed the physician would have intelligently and thoroughly enlightened the jury had he been permitted to do so. Nor would it be a sufficient answer to the claim of error in rejecting the evidence of the physician to say that no prejudice resulted to the defendant because the defendant himself testified on the subject and no evidence to the contrary was offered by the prosecution. It was of the highest importance to the defendant that the fact of his debilitated physical condition at the time of the homicide should be fully presented to the jury in support of his claim that he acted in self-defense. He was not only entitled to testify himself on the subject, but to introduce evidence to corroborate his testimony. He was entitled to present the matter to the jury fully and under the most favorable circumstances. And in that regard it seems hardly necessary to suggest that the jury would be more inclined to favorably consider evidence as to the physical condition of the defendant coming from a reputable physician —a disinterested witness—qualified to speak accurately on the subject, than they would when coming from the defendant, whose testimony in that respect they might consider colored in vital self-interest, if for this same reason they did not entirely reject it as untrue.

There is nothing further presented on this appeal for consideration. The judgment and order are reversed and the cause remanded for a new trial.

Angellotti, J., Shaw, J., Henshaw, J., McFarland, J., Sloss, J., and Beatty, C. J., concurred.